UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 10-20896-CR-LENARD/O'SULLIVAN

UNITED STATES OF AMERICA,

    Plaintiff,

v.

QUARTAVIOUS DAVIS

    Defendant.

_____/

## REPORT AND RECOMMENDATION

This matter came before the Court pursuant to Defendant Davis' Motion to Suppress Statements (DE#125, 6/1/11) and Defendant Davis' Motion to Suppress Physical Evidence (DE# 126, 6/1/11). Having held an evidentiary hearing on August 18, 2011 and August 23, 2011 and carefully considered the defendant's motions, the court file and applicable law, the undersigned respectfully recommends that Defendant Davis' Motion to Suppress Statements (DE#125, 6/1/11) and Defendant Davis' Motion to Suppress Physical Evidence (DE# 126, 6/1/11) be **DENIED**.

## BACKGROUND

The defendant was charged by superseding indictment with conspiracy to commit Hobbs Act robbery, in violation of Title 18, United States Code, Section 1951(a), Hobbs Act robbery in violation of Title 18, United States Code, Section 1951(a) and 2 and possession of a firearm in furtherance of a crime of violence in violation of Title 18, United States Code, Section 924(c)(1)(A)(ii) and 2. See Superseding Indictment (DE# 39, 2/22/11).

On June 1, 2011, the defendant filed motions to suppress statements he made during his post-arrest interview on December 23, 2010, photographs of his hand[1] and a DNA sample taken by law enforcement. See Defendant Davis' Motion to Suppress Statements (DE#125, 6/1/11); Defendant Davis' Motion to Suppress Physical Evidence (DE# 126, 6/1/11). The government initially argued that the Defendant Davis' Motion to Suppress Statements (DE#125, 6/1/11) should be denied as moot because the government did not intend to introduce the defendant's statements against the defendant in the government's case-in-chief. See Government's Response to Defendant's Motion to Suppress Statements (DE# 137, 6/16/11). The government subsequently filed an amended response indicating that it would use the defendant's statements in cross-examination or in rebuttal. See Government's Amended Response to Defendant's Motion to Suppress Statements (DE# 143, 6/24/11). The government filed its response to the second motion to suppress on June 24, 2011. See Government's Response to Defendant's Motion to Suppress Physical Evidence (DE# 142, 6/24/11). The government also filed a Notice of Supplemental Authority in Support of the Government's Response to Defendant's Motion to Suppress Physical Evidence (DE# 156, 7/5/11). No reply was filed.

On August 19, 2011, the undersigned held an evidentiary hearing. The

---

[1] There were two photographs taken of the defendant's hand. The first was taken in the interview room during the defendant's interview. The second photograph was taken after the defendant consented to providing a DNA sample. The government has stated that it will not seek to introduce the first photograph. Thus, the only photograph at issue is the second photograph.

2

undersigned admitted the government's Exhibits 1 through 11 and the defendant's exhibits 101 through 103 into evidence. The government presented the testimony of Detective Jose De La Paz, Detective Fred Anderson and Sergeant Edward McCardle. The defendant called psychologist Heather Holmes[2] and Detective Mark Copley. The defendant also testified on his own behalf. The defendant's counsel objected to the government questioning the defendant on matters related to the underlying charged offenses.

The undersigned allowed the government and the defendant to submit supplemental briefs regarding the scope of the government's cross-examination of the defendant at the suppression hearing. On August 22, 2011, the government and the defendant submitted supplemental briefs. See Defendant Davis' Memorandum on Suppression Hearing Fifth Amendment Issues (DE# 178, 8/22/11); Government's Brief on Scope of Cross-examination at Suppression Hearing (DE# 179, 8/22/11). On August 23, 2011, the undersigned issued an Order determining that the government was permitted to cross-examine the defendant on matters related to the underlying charged offenses for purposes of attacking the defendant's credibility. See Order (DE# 187, 8/23/11).

The undersigned resumed the evidentiary hearing on August 23, 2011. Pursuant to the undersigned's prior ruling, see Order (DE# 187), the government questioned the defendant on facts related to the underlying charged offenses. In response to each

---

[2] The government stipulated to Dr. Holmes' expertise in the field of forensic psychology at the August 19, 2011 evidentiary hearing.

3

question, the defendant asserted his Fifth Amendment privilege against self-incrimination. The undersigned ordered the defendant to respond to each question. Each time, the defendant refused. In light of the defendant's refusal to answer the questions, the government terminated its cross-examination of the defendant. The undersigned allowed the parties to submit additional supplemental briefs on the issues of inevitable discovery and DNA collection. See Order (DE# 186, 8/23/11). The undersigned further ordered the government to file a notice indicating whether it would seek a ruling from Judge Lenard on the defendant's contempt or whether it would prefer that the undersigned issue a Report and Recommendation without taking into consideration the Fifth Amendment issue. On August 24, 2011, the government filed a notice indicating that it would not be pursuing the contempt matter further. See Government's Notice of Intention Not to Pursue Further Cross-Examination of the Defendant. The parties filed their second supplemental briefs on August 27, 2011 and August 31, 2011. See Defendant Davis' Supplemental Memorandum on Suppression Hearing Rebuttal Issues (DE# 194, 8/27/11); Government's Response to Defendant's Supplemental Memorandum (DE# 199, 8/31/11). This matter is now ripe for consideration.

## FINDINGS OF FACT

On September 25, 2010, four individuals robbed a beauty salon and a taekwondo school in a strip mall in Miami-Dade County, Florida. A witness obtained the tag of the getaway vehicle and police issued a BOLO[3] alert for the vehicle. The vehicle

---

[3] A "BOLO" is an acronym for "be on the look out."

was located a short time later. Police recovered a t-shirt from the vehicle. A victim identified the t-shirt as worn by one of the robbers during the robbery. Police submitted the t-shirt for DNA testing and obtained a DNA profile. See Government's Exhibit 5. The DNA profile did not match any of the individuals in the CODIS[4] system.

Police spoke to the owner of the vehicle who stated that she lent the vehicle to her boyfriend, Jahmal Martin. Mr. Martin is a co-defendant in the instant case. The owner of the vehicle also stated that Mr. Martin was in contact with Jamarquis Reid and Willie Smith. Mr. Reid and Mr. Smith are co-defendants in this case.

Police interviewed Mr. Reid and Mr. Smith in connection with the robberies. Mr. Reid and Mr. Smith stated that they committed the robberies and that the driver of the getaway vehicle was Jahmal Martin. They did not identify the fourth robbery suspect. Police were able to determine that the DNA obtained from the t-shirt did not belong to Messrs. Martin or Reid. See Government's Exhibit 5. Police later determined that the DNA obtained from the t-shirt did not belong to Mr. Smith. See Government's Exhibit 7.

On or about October 1, 2010, a robbery occurred at a jewelry store in Broward County, Florida. The robbery was committed by four individuals. Two of the robbers used sledge hammers to break glass casings. The robbers left bloodstains inside the jewelry store. A stolen BMW was used as the getaway vehicle. The robbers left bloodstains on the backseat of the BMW. Police were able to obtain DNA profiles for two individuals from the bloodstains recovered from the jewelry store and the BMW. A DNA profile suggested that one of the bloodstains recovered from the BMW could

---

[4] CODIS is the Combined DNA Index System. CODIS stores DNA profiles of individuals with a felony past.

belong to Michael Martin. See Government's Exhibit 9. The other DNA profile obtained from the bloodstains matched the DNA profile obtained from the t-shirt worn by the unidentified suspect in the September 25, 2010 robberies. Id.

Miami-Dade Police Detective Jose De La Paz investigated the September 25, 2010 robberies at the beauty salon and the taekwondo school. After learning of the DNA profile match, Detective De La Paz contacted Broward Sheriff's Office Detective Fred Anderson, the detective investigating the jewelry store robbery. Detective Anderson informed Detective De La Paz that co-defendant Michael Martin had been arrested on or about November 23, 2010 in connection with the jewelry store robbery. Mr. Martin told police that he was involved with the jewelry store robbery along with Jamarquis Reid, Sylvester Fisher and the defendant. Mr. Martin further stated that himself, Mr. Fisher and the defendant entered the jewelry store and that the defendant carried a sledgehammer. Police also showed Mr. Martin surveillance video from the jewelry store robbery. Mr. Martin identified for police the individuals shown on the surveillance video. The video shows the defendant breaking glass casings with the sledgehammer. The video also shows Mr. Martin and Mr. Davis getting into the backseat of the BMW where the bloodstains were found.

Based on Mr. Martin's statement, the defendant was arrested on December 23, 2010 pursuant to an arrest warrant issued by a judge. On that day, the defendant was taken to an interview room at the Broward Sheriff's Office.[5] The walls of the interview rooms at the Broward Sheriff's Office are padded to improve the sound quality of the

---

[5] The defendant testified that at the time of his arrest, he had not slept for days. Additionally, the defendant testified that the had smoked four "joints" of marijuana just prior to his arrest.

recording equipment. The interview room was similar to other interview rooms at the Broward Sheriff's Office.

Detective De La Paz, Detective Anderson and Detective Mark Copley interviewed the defendant. The defendant was handcuffed and his feet were shackled for most of the interview.[6] The interview began at 12:57 PM and ended at 4:15 PM. No other detectives were in the room with the defendant. At times during the interview, some or all of the detectives stepped out of the interview room. The detectives left the defendant alone for approximately 21 minutes from 2:45 PM to 3:06 PM. The detectives offered the defendant food and something to drink. The defendant refused both. The detectives did not hit or threaten the defendant.

The defendant's interview was audio and video recorded. See Government's Exhibit 1; Defendant's Exhibit 101. At the outset, the detectives discussed the defendant's background with the defendant. The defendant stated that he did not finish high school. The defendant was asked whether he would speak to the detectives without an attorney. The defendant responded "nope." Notwithstanding the defendant's response and in violation of the defendant's Miranda[5] rights, Detective Anderson continued the interview by asking the defendant if there was a reason he would not speak to the detectives. The defendant then responded that he would speak to the detectives. The detectives proceeded with the interview. All three detectives knew that the interview should have stopped when the defendant stated that he would not speak

---

[6] Detective Copely removed the shackles from the defendant's feet at approximately 3:07 PM.

[5] Miranda v. Arizona, 384 U.S. 436, 444 (1966).

without an attorney present. They proceeded with the interview because they believed they could obtain information from the defendant that could be used against the co-defendants. During the interview, the defendant stated several times that he did not want to talk. The detectives did not stop the interview.

The total duration of the interview was approximately three hours and 18 minutes including breaks. At some point during the interview, Detective Anderson told the defendant:

> You know that. You knew that Quat come on now keep it 100. Keep it 100 you knew that. [A]in't no doubt about it that you knew that. You knew it. Why you trying to protect them? I don't know. Why you trying to be hard? I don't know but man it's going to bust you right across the head man and you going to **you know when its going to hit you? When your sitting in prison ok and your roommate has been to prison 4 times over and he getting ready to punk your a\*\* out. Then you going to be like God dammit . . . I could have just been sitting at home probably if I would have just laid it all out. Why try to protect these guys.**

Defendant's Exhibit 101 at 91-92 (emphasis added). In using the phrase "punk your a\*\* out," Detective Anderson sought to convey to the defendant that he would have to defer to his more experienced cellmate[6] – meaning the defendant would have to give up his

---

[6] According to the defendant, the phrase "punk your a\*\* out" indicated to the defendant that if he went to prison, he would be anally raped by his cellmate. The undersigned does not find this testimony credible for the reasons discussed below. The undersigned credits Detective Anderson's testimony that the phrase "punk your a\*\* out" refers to the defendant having to make concessions to a more experienced cellmate. See United States v. Boulette, 265 Fed. Appx. 895, 898 (11th Cir. 2008) (citing United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002) (noting that "[c]redibility determinations are within the province of the fact finder 'because the fact finder is in a better position than a reviewing court to assess the credibility of witnesses.'"). The undersigned notes that the defendant is facing a substantial term of imprisonment and has an interest in testifying favorably. Additionally, the defendant testified inconsistently at the suppression hearing. On direct examination the defendant testified that when he used the phrase "you have me f\*\*\*ed up" at the December 23, 2010 interview he meant that he was confused and tired. On cross-examination the defendant admitted that the

telephone time or make other concessions to his cellmate.[7]

During the interview, the detectives asked the defendant numerous times if he would provide a DNA sample. Each time, the defendant refused. During the interview, the detectives showed the defendant photographs of co-defendants Jamarquis Reid, Willie Smith, Michael Martin and Sylvester Fisher. The defendant denied knowing these individuals. The detectives asked the defendant if he had ever been to Broward County. The defendant denied ever traveling to Broward County. The detectives also asked the defendant if he had been in the BMW that was used as the getaway vehicle for the jewelry store robbery. The defendant denied ever being in a BMW.

During the interview, the defendant was asked numerous times to provide a DNA sample. The defendant refused each time.[8] Detective De La Paz told the defendant that if he provided his DNA, he would be exculpated. The detectives also told the defendant that if he did not provide consent, they would obtain a search warrant for his DNA. See Transcript of Post-Arrest Interview (DE# 183-1 at 35-36, 8/23/11). The detectives

---

phrase "you have me f***ed up" meant you have me confused with a lesser man.

[7] The defendant also testified that in November 2010, the defendant's girlfriend received a visit from a police officer. The defendant's girlfriend called the defendant and placed the call on mute so the defendant could hear what the police officer was saying. The police officer stated that the defendant was buying his girlfriend lots of expensive things and that the defendant was going to go to prison and become someone's "bitch." According to the defendant, the police officer suggested that if the defendant were ever released from prison, the defendant's girlfriend would not want the defendant because the defendant would like other men. However, the defendant did not know the identity of this police officer who made these statements. Thus, the Court cannot attribute these statements to Detective Anderson.

[8] At some point during the interview, Detective De La Paz took a photograph of the defendant's hand. The government does not intend to use the photograph taken during the interview at trial.

terminated the interview because the defendant would not admit to any involvement in the robberies and would not implicate his co-conspirators.

After the interview ended, Detective De La Paz left the Broward Sheriff's Office. Detectives Anderson and Copley took the defendant out of the interview room and into a large open area in the robbery unit. The open area is divided into open spaces and cubicles and there are generally 50 or 60 people working in that area including civilian employees. The detectives sat the defendant in a chair near the desk of Sergeant Edward McCardle. The detectives informed Sergeant McCardle that the defendant had not submitted his DNA. The defendant was handcuffed and his feet were shackled. Detectives Anderson and Copley returned to their respective desks to complete the necessary paperwork so that the defendant could be transported to the Broward County Jail.

Sergeant McCardle told the defendant that if he submitted his DNA, it could potentially clear his name. The defendant did not respond to Sergeant McCardle. Approximately, twenty-five to thirty minutes later, Sergeant McCardle asked the defendant if he wanted to give his DNA and told him it could clear his name. This time, the defendant agreed to provide his DNA.[9]

After Sergeant Edward McCardle informed Detectives Anderson and Copley that the defendant had agreed to provide a DNA sample, one of the detectives obtained an audio recorder to put the defendant's consent on the record. See Government's Exhibit

---

[9] The defendant testified that he did not want to give a DNA sample and did not want his hand photographed. He stated that he gave his consent because he thought that if he refused, he would continue to sit for hours until he agreed to provide his DNA. As indicated above, the undersigned does not find the defendant's testimony credible.

3. The defendant was read the Consent to Provide DNA Sample for Lab Analysis form. See Government's Exhibit 4.[10] The defendant, Detective Anderson and Detective Copley signed the form. Detectives Anderson and Copley did not yell at the defendant or make threats. The form advised the defendant that he had a right to refuse consent. After the defendant provided his consent, Detective Anderson took a DNA sample from the defendant. Detective Anderson also asked the defendant if he could photograph his hand. The defendant consented to have his hand photographed.

---

[10] The defendant presented the testimony of Dr. Heather Holmes, a psychologist. Dr. Holmes interviewed the defendant for one and a half to two hours. Dr. Holmes also spoke to the defendant's mother by telephone and reviewed the video of the defendant's interview at the Broward Sheriff's Office on the date of his arrest. Dr. Holmes administered the Weschsler Adult Intelligence Scale-IV (WAIS-IV) test and the Rey 15-Item Test of Malingering to the defendant. Dr. Holmes found no indication of malingering. The defendant's score on verbal comprehension on the WAIS-IV fell into the borderline range. Dr. Holmes opined that the defendant suffers from a verbal learning disability. Dr. Holmes noted that the defendant had been diagnosed with a learning disability and bipolar disorder based on information provided by the defendant and his mother. Dr. Holmes also noted that the defendant had been sleep deprived and under the influence of marijuana on the date of his interview with law enforcement officers based on information relayed to her by the defendant. Dr. Holmes opined that the defendant would not be able to understand some of the words on the consent form (Government's Exhibit 4). The undersigned is not persuaded by Dr. Holmes' testimony regarding the defendant's ability to understand the consent form. The undersigned notes that the defendant knew the information he provided to Dr. Holmes would be conveyed to his defense attorney and to the Court. Additionally, the undersigned had an opportunity to observe the defendant both in the courtroom and on the stand during the two-day evidentiary hearing. The undersigned notes that the defendant had no difficulty responding to questions and communicating information on both direct and cross-examination. Additionally, the defendant appeared to understand the concept of DNA sampling when the issue was discussed in his videotaped/recorded interview with law enforcement. Thus, the undersigned finds that the defendant understood the consent form (Government's Exhibit 4).

## ANALYSIS

A.     Motion to Suppress Statements (DE# 125)

The defendant seeks to suppress the statements he gave to law enforcement officers during his post-arrest interview at the Broward Sheriff's Office. The government concedes that the defendant's statements were taken in violation of the defendant's Miranda rights. See Government's Amended Response to Defendant's Motion to Suppress Statements (DE# 143 at 1-2, 6/24/11). Nonetheless, it argues that the defendant's statements were entirely voluntary and as such the government will seek to use them for impeachment purposes if the defendant testifies at trial. Id. at 2.[11]

Statements made in violation of Miranda are generally not admissible at trial. Miranda, 384 U.S. at 444. However, "[t]he shield provided by Miranda cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." Harris v. New York, 401 U.S. 222, 226 (1971). Thus, "so long as they are voluntary, statements obtained in violation of a defendant's Fifth or Sixth Amendment right to counsel cannot be used in the prosecution's case-in-chief against the defendant, but may be used for impeachment purposes." McGriff v. Dept. of Corrections, 338 F.3d 1231, 1236 (11th Cir. 2003) (citing Michigan v. Harvey, 494 U.S. 344, 351-52 (1990) (Sixth Amendment); Harris v. New York, 401 U.S. 222, 225-26 (1971) (Fifth Amendment)); see also Oregon v. Hass, 420 U.S. 714, 722 (1975) (holding that a defendant's statement taken in violation of Miranda that was nonetheless voluntary could be used at trial for impeachment purposes). An

---

[11] The government has indicated that it will not use these statements in its case-in-chief.

involuntary statement, on the other hand, cannot be used by the government for any purpose at trial. See United States v. De Parias, 805 F.2d 1447, 1456 (11th Cir.1986), overruled on other grounds United States v. Kaplan, 171 F.3d 1351, 1356-57 (11th Cir. 1999). Thus, the issue here is whether the statements made by the defendant to law enforcement officers during his post-arrest interview were voluntary.

Whether a statement is voluntarily given must be examined under the totality of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). The Supreme Court has held that a defendant's statement to authorities is voluntary if it is "the product of a rational intellect and a free will." Mincey v. Arizona, 437 U.S. 385, 398 (1978) (quoting Blackburn v. Alabama, 361 U.S. 199, 208 (1960)). "Among the factors [the Court] must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." Hubbard v. Haley, 317 F.3d 1245, 1253 (11th Cir. 2003) (citing Bustamonte, 412 U.S. at 226; United States v. Gonzalez, 71 F.3d 819, 828 (11th Cir.1996)). In Mincey, the Supreme Court concluded that a defendant's statements were not voluntarily where a police officer interrogated the defendant while the defendant was in the intensive care unit of the hospital, in severe pain and "encumbered by tubes, needles, and breathing apparatus." Mincey, 437 U.S. at 398-99.

In the instant case, the defendant argues that his post-arrest statements to the detectives were involuntary. The defendant argues that he was sleep deprived and under the influence of marijuana during his post-arrest interview. The undersigned finds that these facts are insufficient to render the defendant's statements involuntary. See Hubbard, 317 F.3d at 1253 (finding that the presence of one factor – intoxication – did

not necessarily lead to the conclusion that the defendant's statements were coerced). Here, although the defendant testified that he had smoked four "joints" of marijuana just prior to his arrest and had been sleep deprived, the video of the defendant's interview shows that the defendant did not have trouble understanding the police officers or responding to their inquiries. For the most part, the defendant appears alert and coherent in the video.[12] The defendant did not have slurred speech and did not appear to be intoxicated or under the influence of marijuana. See Hubbard, 317 F.3d at 1253 (finding defendant's statements were voluntary where "[the defendant] did not appear to be intoxicated or suffering from delirium tremens at the time he spoke to [the detective] at the police station."). The defendant also argues that he was coerced. The undersigned finds no evidence of coercion. The detectives did not draw their weapons at the defendant, make any threats or physically harm the defendant. Of note, the defendant made no inculpatory statements during his post-arrest interview suggesting that the defendant's will was not overborne by the detectives. The fact that the defendant did not finish high school is also insufficient to conclude that his statements were involuntary. Although Dr. Holmes opined that the defendant suffers from a verbal learning disability, the defendant had no difficulty responding to the detectives' verbal inquiries at his post-arrest interview and testifying at the suppression hearing in the instant case. Moreover, "[t]he Eleventh Circuit] ha[s] held previously, ''coercive police activity is a necessary predicate to a finding that the confession by a person with a low

---

[12] The defendant had his head down at the beginning of the interview but soon made eye contact with the detectives and responded to their questions. The defendant also put his head on a table during the approximate 21 minutes he was left alone in the interview room. Towards the end of the video the defendant keeps his head down.

intelligence level is involuntary.'" Hubbard, 317 F.3d at 1254 (citing Singleton v. Thigpen, 847 F.2d 668, 671 (11th Cir.1988)). Based on the totality of the circumstances, the undersigned concludes that the defendant's post-arrest statements to law enforcement were made knowingly and voluntarily. Thus, the Defendant Davis' Motion to Suppress Statements (DE#125, 6/1/11) should be **DENIED**.

**B.     Motion to Suppress Physical Evidence (DE# 126)**

The defendant also seeks to suppress the photograph of the defendant's hand taken by the detectives and the defendant's DNA sample. The defendant argues that this evidence must be suppressed because the consent in this case was not voluntary: "[b]efore obtaining the defendant's purported consent, the officers repeatedly and systematically violated his Miranda rights, his constitutional rights to silence and counsel, as well as his due process right to be free from a coerced involuntarily interrogation." See Defendant Davis' Motion to Suppress Physical Evidence (DE# 126, 6/1/11).

In its response, the government argued that "the question of whether or not the defendant consented to the DNA sampling, or whether his consent was voluntary[] is . . . beside the point" because "Florida law requires that '[e]ach qualifying offender shall submit a DNA sample at the time he or she is booked into a jail, correctional facility, or juvenile facility.'" Government's Response to Defendant's Motion to Suppress Physical Evidence (DE# 142 at 10-11, 6/24/11) (citing Fla. Stat. § 943.325(3)(a)) (alteration in original). The government then argued that the Florida statute is constitutional. Id. at 11-13.

"A fundamental principle of constitutional law dictates that a federal court should

refuse to decide a constitutional issue unless a constitutional decision is strictly necessary." Cone Corp. v. Florida Dept. of Transp., 921 F.2d 1190, 1210 (11th Cir. 1991) (citations omitted); see also PVC Windoors, Inc. v. Babbitbay Beach Const., N.V., 598 F.3d 802, 807 (11th Cir. 2010) (stating that "federal courts are duty bound to avoid a constitutional question if answering the question is unnecessary to the adjudication of the claims at hand"). Thus, the Court must first determine if the defendant consented to producing the DNA sample. If there was consent, the Court does not need to determine the constitutionality of the state statute. If there was no consent, the Court will need to determine if there would have been inevitable discovery. Finally, only if the Court determines that there was no consent and no inevitable discovery, should the Court address the constitutionality of the state statute.[13]

"[G]eneral[ly,] . . . warrantless searches are per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions." United States v. Gonzalez, 71 F.3d 819, 825 (11th Cir.1996) (quotations omitted). "[I]t is well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search conducted pursuant to consent to search." Id. at 827. The government has the burden of proving that consent to search was given voluntarily, as an independent act of free will and not mere acquiescence to police authority. Florida v. Royer, 460 U.S. 491 (1983). To be considered voluntary, a consent to search must be the product of an essentially free and unconstrained choice. United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989).

---

[13] At the August 19, 2011 evidentiary hearing, the government agreed that the Court should not address the constitutionality of the state statute first. See Transcript (DE# 205 at 5, 9/22/11).

Whether consent was in fact voluntary or a product of express or implied duress or coercion is to be determined by the totality of the circumstances. United States v. Mendenhall, 446 U.S. 544 (1980). Here, the defendant consented to providing the DNA sample and to having his hand photographed. The defendant was presented with a Consent to Provide DNA Sample for Lab Analysis form (Government's Exhibit 4). The form was read to the defendant. The form specifically advised the defendant that he had a right to refuse to give the DNA sample. The defendant appeared to understand the meaning of the form and the defendant voluntarily signed the form. No threats were made to the defendant and the defendant was not otherwise coerced into signing the form. The fact that the detectives violated the defendant's Miranda rights during the post-arrest interview does not invalidate the defendant's subsequent consent to provide the DNA sample or his verbal consent to the photograph. See United States v. Hidalgo, 7 F.3d 1566, 1568 (11th Cir. 1993) (finding defendant's consent valid even though it was obtained after the defendant had been given Miranda warnings and had invoked his right to remain silent).

Even assuming, arguendo, that the defendant did not voluntarily consent to providing the DNA sample, the undersigned concludes that the DNA sample should not be suppressed under the inevitable discovery doctrine.

> In order for evidence to qualify for admission under th[e inevitable discovery] exception to the exclusionary rule, there must be a reasonable probability that the evidence in question would have been discovered by lawful means, and the prosecution must demonstrate that the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct.

Jefferson v. Fountain, 382 F.3d 1286, 1296 (11th Cir. 2004). The government must

demonstrate the applicability of the inevitable discovery doctrine by a preponderance of the evidence. United States v. Drosten, 819 F.2d 1067, 1070 (11th Cir. 1987). Here, prior to the defendant's arrest, law enforcement officers knew that the bloodstains in the back seat of the BMW belonged to two different individuals. Law enforcement officers knew from speaking to Michael Martin that the defendant was involved in the jewelry store robbery. Law enforcement officers also knew from reviewing the surveillance video of the jewelry store robbery that Mr. Martin and the defendant sat in the backseat of the BMW where the bloodstains were found and that the defendant broke the glass casings inside the jewelry store using a sledgehammer. Thus, at the time of the defendant's arrest, law enforcement officers had sufficient evidence to support a search warrant for the defendant's DNA. Additionally, the officers had planned on obtaining a search warrant if the defendant did not provide consent. At the evidentiary hearing, Detective Anderson testified as follows:

> Q. Would it be fair to say that the reason you wanted him to consent to give DNA on December 23rd, 2010 was that you wouldn't get it otherwise on that today?
>
> A. No, that's not true. I had told Mr. Davis that I would get a warrant from the Judge to get a sample of his DNA.
>
> Q. That day?
>
>  **A. I would have went and got it that day, yes.**
>
> \*       \*       \*
>
> Q. He didn't do that until Sergeant McCardle went over there and came back and told you. Did you start doing that DNA warrant thing, or were you doing the jail paperwork?
>
> A. I was doing the jail paperwork.

>   **Q. So you weren't going to get a warrant, were you?**
>
>   **A. I would have.**
>
>   **Q. But not that day?**
>
>   **A. I would have, yes.**

See Transcript of August 19, 2011 Hearing (DE# 205 at 82-83, 9/22/11) (emphasis added). During the December 23, 2010 post-arrest interview, the detectives also told the defendant that if he did not provide consent, they would obtain a search warrant for his DNA. See Transcript of Post-Arrest Interview (DE# 183-1 at 35-36, 8/23/11). The undersigned concludes that the government has met its burden under the inevitable discovery doctrine.

Similarly, even if the defendant's consent to having his hand photographed is invalid, the photograph should not be suppressed because the defendant had no legitimate expectation of privacy in his hand. The Supreme Court has observed that:

> The physical characteristics of a person's voice, its tone and manner, as opposed to the content of a specific conversation, are constantly exposed to the public. Like a man's facial characteristics, or handwriting, his voice is repeatedly produced for others to hear. No person can have a reasonable expectation that others will not know the sound of his voice, any more than he can reasonably expect that his face will be a mystery to the world.

United States v. Dionisio, 410 U.S. 1, 14 (1973). Here, the defendant "can[not] reasonably expect that his [hand] will be a mystery to the world." Id.

In sum, the undersigned concludes that the Defendant Davis' Motion to Suppress Physical Evidence (DE# 126, 6/1/11) be **DENIED** because the defendant consented to providing a DNA sample and having his hand photographed by the detectives. Even if the defendant's consent was invalid, the DNA sample should not be

suppressed under the doctrine of inevitable discovery and the photograph should not be suppressed because the defendant had no legitimate expectation of privacy in his hand. Accordingly, the undersigned does not reach the constitutionality of the state statute.

## **RECOMMENDATION**

For the foregoing reasons, the undersigned recommends that Defendant Davis' Motion to Suppress Statements (DE#125, 6/1/11) and Defendant Davis' Motion to Suppress Physical Evidence (DE# 126, 6/1/11) be **DENIED**. Pursuant to 28 U.S.C. §636(b)(1)(B) and (c), the parties may serve and file written objections to this Report and Recommendation with the Honorable Joan A. Lenard, United States District Judge, within fourteen (14) days of receipt of a copy of this Report and Recommendation. See Nettles v. Wainwright, 677 F. 2d 404 (5th Cir. 1982).

RESPECTFULLY SUBMITTED at the United States Courthouse, Miami, Florida this **30th** day of September, 2011.

_____
JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies provided to:
United States District Judge Lenard
All counsel of record